IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Patrick Keenan, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 16-cv-4530 |
| v. | ) |
| | ) Judge Joan B. Gottschall |
| Home Depot U.S.A., Inc., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

This diversity negligence and premises liability action arises out of an accident that occurred on February 3, 2006, in a Home Depot store in Countryside, Illinois. *See* Compl, ECF No. 1-1. Plaintiff Patrick Keenan ("Keenan") testified that a safety cable snapped up and hit him in the eye as he reached into a lumber bin to retrieve a board. *See* Pl.'s Resp. to Def.'s Statement of Material Facts ("Resp. to SOF") ¶¶ 40, 41, ECF No. 99-2. The court has before it the amended motion of defendant Home Depot U.S.A., Inc. ("Home Depot") for summary judgment. Home Depot argues that it did not owe Keenan a duty of care and that no reasonable jury could find that Home Depot's negligence proximately caused his injury. For the following reasons, the court grants Home Depot's motion on the duty of care element of Keenan's claims.

**I. Summary Judgment Standard**

Summary judgment is proper where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the court considers "all of the evidence in the

record in the light most favorable to the non-moving party," and draws "all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018)).

The party seeking summary judgment bears the initial burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169.

## II. Facts

The court recites the facts in keeping with summary judgment principles, resolving genuine disputes for Keenan and drawing reasonable inferences in his favor. *See Donald, supra*, 982 F.3d at 457. Keenan arrived at the Countryside Home Depot store between 8:30 and 9:00 a.m. Resp. to SOF ¶ 26. He had been to the store on prior occasions, and the display of lumber looked the same as it had when he shopped on those occasions. *See id.* ¶ 33.

### A. The Accident

Keenan made his way to aisle 17 and began loading 1x6 and 1x8 boards into his shopping cart. *See* Resp. to SOF ¶¶ 26, 27, 38. Consistent with Home Depot corporate policy, the boards were stacked vertically, leaning toward the bin's rear. *See* Resp. to SOF ¶¶ 28–29; Def.'s Resp. to Pl.'s Statement of Add'l Facts ("Resp. to SAF") ¶ 14, ECF No. 100.

It is undisputed that the bin was well-stocked and "not in disarray" when Keenan began loading boards into his cart. Resp. to SOF ¶¶ 34–35. Keenan testified that the following

2

photograph, taken by an assistant store manager shortly after the accident, accurately depicts the lumber bin's condition before the accident occurred. Resp. to SOF ¶ 53.



Def. Ex. 6, ECF No. 95-6.

As the photograph shows, the lumber bin was divided into sections by white m-bars attached to orange beams at the bin's rear. *See* Grzeskowiak Dep. 35:10–14, 42:3–9, Def. Ex. 4, ECF No. 95-4. A gray bracket is attached to some of the m-bars. *Id.* at 43:4–5. The safety cable running along the front of the bin can be passed through or clipped to loops on the gray bracket. *See* Resp. to SAF ¶ 24; Resp. to SOF ¶ 62; Grzeskowiak Dep. 42:19–43:5, 43:14–20. The height of the cable can be adjusted. *See* Resp. to SAF ¶ 24; *see also* Grzeskowiak Dep. 35:21–23 (uncited testimony that there are two sizes of m-bar). "The purpose of the safety cable is to prevent the lumber from falling out of the bin and hitting anybody in the head." Resp. to SAF

3

¶ 25 (citation omitted). As discussed below, the safety cable's height and the amount of tension on the cable are disputed.

Keenan loaded each board by lifting it and sliding it out of the bin. Resp. to SOF ¶¶ 36–38. He successfully retrieved two boards before the accident. Resp. to SOF ¶ 39. Keenan's deposition testimony about how the accident occurred must be treated as true at summary judgment:

> Q. Okay. When you got at least two boards out, you went to retrieve another one, correct?
>
> A. Yes.
>
> Q. And did anything unusual happen when you got that board?
>
> A. Yes.
>
> Q. And what was that?
>
> A. When I went to retrieve another board, I just went to grab it like I had grabbed the other boards and the protective cable snapped up and it got taut and hit me in the eye.
>
> Q. Now, when you say it became taut, what caused it to become taut?
>
> A. The wood in another bay had fallen forward and then the protective cable did what, I presume was there to do, it caught the wood and prevented it from falling into the aisle. And then where I was it [sic], there was slack on the cable and the wood caught it and it became taut and it moved upwards just as I was leaning in to get the board that I needed.

Keenan Dep. 21:9–22:5; *see also* Resp. to SAF ¶¶ 30, 32–34; Resp. to SOF ¶¶ 40-41, 43–44 (both summarizing this testimony).

Keenan's back was turned when the accident occurred, so he did not see how the board came to be leaning against the cable.[1] *See* Resp. to SOF ¶ 45. The board could have been in

---

1. Keenan testified that he may have moved the board before he reported the accident. *See* Keenan Dep. 27:23–24. The court cannot and does not rely on this testimony, however, because the parties did not cite it in their LR 56.1 fact statements. The court therefore expresses no view on what, if any, (continued on next page)

either an immediately adjacent section of the display (one m-bar away) or further. *See* Resp. to SOF ¶ 48. After the accident, Keenan saw another customer at the end of the aisle. Resp. to SOF ¶ 49.

Keenan reported the accident to store personnel. Assistant store manager Tim Naumann accompanied Keenan to the bin, took photographs, and wrote a short incident report. *See* Resp. to SOF ¶ 50; Resp. to SAF ¶¶ 1–2; Naumann Dep. 13:23–18:20, Def. Ex. 2, ECF No. 95-2. Naumann took the photo above during the inspection. Naumann found no board leaning against the safety cable when he returned to the display with Keenan, and the incident report noted no other safety concerns. *See* Resp. to SOF ¶¶ 52–54.

### B. *Home Depot Policies and Safety Checklists*

The Countryside Home Depot store employs four lumber associates and a lumber department supervisor, Nathan Grzeskowiak, who is responsible for day-to-day operations. Resp. to SOF ¶ 12; Resp. to SAF ¶¶ 9–12. The record does not reveal the associates' shifts and work schedules nor how many associates were on duty on the day of Keenan's accident. Each lumber associate must complete 8–12 hours of training before being allowed to work in the lumber department. Resp. to SAF ¶¶ 16–18. The training consists of watching videos on Home Depot's employees-only website and answering questions, presumably about the topic of the training video. *See* Resp. to SAF ¶¶ 17–19. Home Depot has no written training materials, and the summary judgment record does not include the training videos. *See* Resp. to SAF ¶ 20. Home Depot also requires employees to complete ongoing safety training once a year, but

---

significance Keenan's testimony that he may have moved the board may have on the summary judgment analysis.

whether any of the ongoing training bears on the issues raised in this case has not been explained. Resp. to SAF ¶ 23

Home Depot policies require the lumber associate on duty when the store opens to walk through the lumber department and complete a store readiness checklist; the associate is directed to ensure that the department looks as though "no one [has] shopped it." *See* Resp. to SOF ¶¶ 14–18; *see also* Grzeskowiak Dep. 27:19–28:8. This was generally done first thing in the morning at the Countryside Home Depot store. Resp. to SOF ¶ 9.

The record contains a copy of the store readiness checklist completed on the day of Keenan's accident. Def. Ex. 3, ECF No. 95-3; *see also* Resp. to SOF ¶ 6. As discussed in the analysis below, Keenan has submitted a different safety checklist bearing a revision date of September 14, 2006, which he claims was on Home Depot's website. ECF No. 72-7. For Keenan, the critical difference between the two checklists is that the checklist revised September 14, 2006, requires the safety cable to be secured at a height of seven feet while the checklist completed on the day of Keenan's accident does not mention the height of the safety cable. *Compare* Def. Ex. 3 at 1, ECF No. 95-3; *with* Pl. Ex. 3, ECF No. 72-7. Home Depot disputes the authenticity of the September 14, 2006, checklist.

The checklist completed on the day of Keenan's accident includes the following items: "[t]here is no leaning or protruding merchandise," "lumber safety poles [are] in place at the shopping level," and "safety cables or beams [are] used to secure vertically stacked merchandise (example: 1x merchandise)." Def. Ex. 3 at 1. The inspector was expected to note any safety concerns on the checklist. Resp. to SOF ¶¶ 7, 10. No leaning or protruding merchandise is noted in the checklist for February 3, 2016, indicating that no such safety concerns were observed. Def. Ex. 3 at 1; Resp. to SOF ¶ 10. In addition to a morning walkthrough, Home

6

Depot policies require lumber associates to spend most of the workday in the lumber department, direct lumber associates to address any safety concerns they encounter, and require assistant store managers to walk through the store to look for safety and neatness concerns throughout the day. *See* Resp. to SOF ¶¶ 19–21.

Grzeskowiak, the lumber department supervisor at the Countryside store, testified that on other occasions, he has seen the safety cable catch lumber and prevent it from falling into the aisle. Resp. to SAF ¶ 26. The cable became taut when this occurred. *See* Resp. to SAF ¶ 28. Home Depot contends that Grzeskowiak's testimony is limited to lumber falling in the same section of the bin, rather than in a section separated from the customer by one or more m-bars. *See id.* Seen favorably to Keenan, however, Grzeskowiak's testimony is ambiguous; it need not be read as limited to lumber falling in the same bin. *See* Grzeskowiak Dep. 48:2–4. Grzeskowiak clarified that he has seen the cable move outward, rather than upward, when lumber fell onto it. Grzeskowiak Dep. 48:5–8; Resp. to SAF ¶ 29. Thus, a reasonable jury could find from Grzeskowiak's testimony that he had observed a safety cable become taut when lumber in a nearby bin fell onto the safety cable. *See ibid*. Grzeskowiak does not say how frequently he saw lumber fall, what he did about it, or whether he considered lumber falling to be an ongoing safety risk based on what he saw. *See ibid.*

### C. Defendant's Expert Report

Home Depot submits the expert report of Jon Ver Halen, P.E. ("Ver Halen"), an engineer. *See* Ver Halen Report and CV, Def. Ex. 7, ECF No. 95-7; *see also* Resp. to SOF ¶¶ 58–64. On the day he visited the Countryside Home Depot store, Ver Halen measured the height of the safety cable as 6'7" at the point where the cable met the mounting bracket and 5'10" in the middle of the bin. Ver Halen Report 3. Ver Halen, who is nearly the same height as Keenan (respectively, 6'3" and 6'2"), attempted to simulate the accident as Keenan described it at his

7

deposition. Ver Halen leaned into the bin to retrieve a board. *See id.* at 4–6. The safety cable hung "barely above his eye height" when he stood straight, and leaning forward brought his eye below the cable's level. *Id.* at 6. Ver Halen took the following photograph to illustrate his opinion that the accident could not have happened as Keenan testified:



ECF No. 103 at 5 (color copy of ECF No. 95-7).

Ver Halen also performed an experiment intended to simulate a board falling on the safety cable. He did not use a board. Ver Halen Report 4. Instead, he pulled on the cable from the immediately adjacent bin. *Id.* Ver Halen observed that at "the bottom of the loop holding the wire is a small area where the wire could become jammed. Trying to pull the wire taut from the next bay resulted in the wire becoming caught in this small area. Although it would still pull through, significant drag and slowing of the cable were noted." *Id.* Ver Halen does not say how

8

hard he pulled on the cable or from what distance. *See id.* Ver Halen opines that the lumber bin was reasonably safe, the safety cable would have been above Keenan's eye height when he was reaching for the board (so the accident could not have occurred as Keenan testified), and a "board striking the safety wire in the next bay could not cause a violent tightening of the safety wire." Ver Halen Report 6.

An expert may base an opinion on one version of disputed facts and explain the basis of his opinion to the trier of fact, but the expert cannot vouch for the accuracy of one or another version of disputed facts. That is the jury's function. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613–14 (7th Cir. 2002); *In re James Wilson Assocs.*, 965 F.2d 160, 172–73 (7th Cir. 1992); *see also* Fed. R. Evid. 703. Where an expert "assumes the very fact that he has been hired to prove, his testimony is not helpful to the trier of fact in determining that same fact in issue." *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999).

Ver Halen assumes (1) the cable was secured at 6'7" when the accident occurred; (2) the force Ver Halen used to test the cable's drag approximates the force of a falling board; and (3) a board in the immediately adjacent bin fell (Keenan testified the board could have been further from him, *see* Resp. to SOF ¶ 48). *See* Ver Halen Report 2, 4, 6. Ver Halen offers no scientific or technical reason that the jury must accept his assumptions rather than making up its own mind about these genuinely disputed facts. *See id.* at 2–6. Regarding the cable's height, he points to the photograph taken by Nauman on the day of the accident and reproduced above. Ver Halen Report 2.

The photographs are not nearly as clear as Ver Halen assumes for several reasons, primarily the fact that they appear to be taken from different perspectives. *Compare* ECF No. 95-3, *with* ECF No. 95-7 at 2. This court ordered Home Depot to supplement the record

9

with color photographs in the hope that color copies would make the basis of Ver Halen's cable height comparison clear. *See* ECF No. 102. The color copies did not dispel the ambiguity. A reasonable juror could conclude from the photographs in the summary judgment record that the safety cable was three or four feet from the ground on the date of the accident, or the jury could accept Ver Halen's opinion that it was secured at 6'7". *See* Resp. to SOF ¶ 58. The jury would therefore be entitled to discredit Ver Halen's opinions if it finds the disputed facts–the cable's height and the distance and force of the falling board—to be contrary to Ver Halen's assumptions and consistent with Keenan's testimony.

### III. Analysis

"[W]here a landowner's conduct in creating an unsafe condition precedes the plaintiff's injury, a plaintiff may elect to pursue a negligence claim, a premises liability claim, or both." *Greenhill v. REIT Mgmt. & Rsch., LLC*, 156 N.E.3d 1, 16 (Ill. App. Ct. 1st Dist. 2019), *appeal denied*, 144 N.E.3d 1186 (Ill. 2020) (citations omitted). Keenan pleaded both claims in his complaint. ECF No. 1-1 at 1–5. The parties do not differentiate between Keenan's negligence and premises liability claims in their briefing, however. "A claim of premises liability is a negligence claim, requiring the plaintiff to prove a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Stanley v. Ameren Ill. Co.*, 982 F. Supp. 2d 844, 855 (N.D. Ill. 2013) (citing *Nelson v. Aurora Equip. Co.*, 909 N.E.2d 931, 934 (Ill. App. Ct. 2nd Dist. 2009)); *accord Garcia v. Goetz*, 121 N.E.3d 950, 958 (Ill. App. Ct. 1st Dist. 2018). Since the parties do not differentiate between Keenan's claims at summary

judgment, the court analyzes them together.[2]  *See, e.g.*, *Barrios v. Fashion Gallery, Inc.*, 255 F. Supp. 3d 728, 729 n.1, 730–31 (N.D. Ill. 2017).

Home Depot contends it owed Keenan no duty to protect him from the cable snapping up and hitting him.  Whether a duty exists is a question of law.  *Carney v. Union Pac. R.R. Co.*, 77 N.E.3d 1, 6 (Ill. 2016) (citing *Bruns v. City of Centralia,* 21 N.E.3d 684, 689 (Ill. 2014)).  The plaintiff bears the burden to prove that the defendant owed a duty of care. *Id.* (citing *Vesey v. Chi. Hous. Auth.*, 583 N.E.2d 538, 541 (Ill. 1991)).

### A. Home Depot Did Not Breach Its Duty to Keep the Store Reasonably Safe.

Illinois landowners owe business invitees like Keenan "a duty of care to keep the premises reasonably safe."  *McCarty v. Menard, Inc.*, 927 F.3d 468, 471 (7th Cir. 2019) (citing *Piotrowski v. Menard, Inc.*, 842 F.3d 1035, 1038 (7th Cir. 2016)).  Four factors must be considered when deciding whether a duty of care exists in a particular case: "(1) the reasonable foreseeability of the harm; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the premises owner."  *Id.* (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 906 (7th Cir. 2018)).

"Illinois courts, including [the Seventh Circuit] sitting in diversity, have repeatedly rejected imposing the duty [on store owners] of continuously monitoring safety conditions." *Id.* at 472 (citing *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 652 (7th Cir. 2014)).  For

---

2. Some courts applying Illinois law emphasize that negligence and premises liability claims have distinct elements that should be analyzed separately.  *See, e.g.*, *Price v. Int'l Paper Co.*, 2020 WL 6044288, at *2 (N.D. Ill. Oct. 13, 2020); *Donald v. Target Corp.*, 2016 WL 397377, at *1–2 (N.D. Ill. Feb. 2, 2016) (collecting citations).  Judge Feinerman has recently suggested that *Carney v. Union Pacific Railroad Co.*, 77 N.E.3d 1, 6–7 (Ill. 2016), shows that premises liability under § 343 of the Restatement (Second) of Torts is a way of establishing a duty of care but is not a separate claim for relief, at least in the sense of federal pleading.  *See Bradley v. United States*, 2021 WL 1837381, at *4–5 (N.D. Ill. May 7, 2021).  This case presents no occasion to wade into the issue, for Keenan articulates a single theory by which Home Depot owed him a duty of care–the voluntary undertaking theory discussed in the text.

instance, in *McCarty*, the plaintiff was loading boards into his cart when he tripped over a sign that had been moved into the shopping aisle. *See id.* at 470. The record showed that the defendant, a large chain store, had internal policies requiring regular inspections to monitor for tripping hazards, that employees were available to assist customers in the lumber department, and that staff regularly cleaned the area. *See id.* at 472. The Seventh Circuit ruled that the store owed the plaintiff no duty of greater care, reasoning in part that "imposing any larger burden on [the store] to guard against safety hazards, such as constant surveillance, would be unreasonably onerous." *Id.* (citing *Dunn*, 880 F.3d at 910).

The undisputed evidence here shows that, like the store in *McCarty*, Home Depot had policies in place requiring assistant managers to walk through and inspect the store throughout the day. *See* Resp. to SOF ¶ 20. Lumber associates at the Countryside Home Depot store must spend most, if not all, of the workday in the lumber department. Resp. to SOF ¶ 19. At least one lumber associate (the "lumber associate on duty") must always be available to assist customers. Resp. to SOF ¶ 13. Home Depot policy requires lumber associates to address any safety concerns they see. Resp. to SOF ¶¶ 20, 21. Additionally, the lumber associate on duty must walk through the store each morning, complete a store readiness checklist (more about this below), address various safety issues (cable height is not specifically listed), and ensure the lumber department looks "like no one [has] shopped it." Resp. to SOF ¶¶ 14–18. The checklist is "generally" completed first thing each morning and was completed on the day of Keenan's accident. Resp. to SOF ¶¶ 5–6, 10.

Keenan does not attempt to distinguish Home Depot's inspections and policies from the policies and practices held to be adequate under Illinois law in *McCarty* and cases like it. *See*

Resp. 8–10, ECF No. 99. In the absence of any such argument, *McCarty* compels the conclusion on this record that Home Depot did not breach its duty to keep the store reasonably safe.

### B. Keenan Has Not Created a Genuine Fact Issue on His Voluntary Undertaking Theory.

Keenan relies on the voluntary undertaking doctrine in support of his duty argument. Resp. 8–10. Illinois courts have adopted the voluntary undertaking doctrine of § 324(a) of the Restatement (Second) of Torts. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1023 (7th Cir. 2018). A defendant that does not otherwise owe the plaintiff a duty of care is nevertheless "liable for breach of a voluntary undertaking if: (a) 'a party undertakes to do something and then fails to exercise reasonable care in a way that increases a third party's risk of harm'; (b) a party 'undertakes to perform a duty that a different party was obligated to perform and then negligently fulfills its duty'; or (c) 'a third party relies to its detriment on the fact that a duty has been voluntarily undertaken.'" *Id.* (quoting *LM ex rel. KM v. United States*, 344 F.3d 695, 701 (7th Cir. 2003)).

Keenan contends that the lumber bin display was unreasonably dangerous as designed and installed. Resp. 8. The accident would not have occurred, Keenan argues, if the safety cable had been secured at seven feet as the purported Home Depot safety checklist dated September 14, 2006, required. *See id.* at 8–10. Keenan's theory is that the purported checklist shows that Home Depot voluntarily undertook a duty to keep the cable seven feet off the ground and that Home Depot negligently performed that duty on the day of the accident. *Id.* at 9–10.

Keenan first attempts to create a fact issue by pointing (Resp. 9) to portions of Grzeskowiak's deposition. In the portions Keenan cites, Grzeskowiak testified he had seen the safety cable catch falling lumber at least once (details are not provided). Grzeskowiak also has seen the cable become taught and move outward, but not upward, when this happened. He has

seen customers moving lumber in a way that might result in a board falling onto the safety cable. *See* SAF ¶¶ 26–29. Taken most favorably to Keenan, this testimony does not create a fact issue because "mere knowledge of a risk does not impose an affirmative duty" under the voluntary undertaking theory. *Hutchison*, 910 F.3d at 1024 (citing *LM ex rel. KM*, 344 F.3d at 701).

Keenan's primary argument is that the purported Home Depot safety checklist dated September 14, 2006, shows that Home Depot voluntarily undertook a duty to ensure that the cable was seven feet off the ground. *See* Resp. 9–10. Keenan cites the Illinois Supreme Court's 1979 decision in *Pippin v. Chicago Housing Authority*, 399 N.E.2d 596. Resp. 10. In *Pippin*, the Chicago Housing Authority contracted with a company called Interstate to provide security guards in public housing buildings. *Id.* at 598. A fatal stabbing occurred in a public housing building's common area, and the victim's mother sued the housing authority on the theory that the authority's contract with Interstate and provisions of state law amounted to a voluntary undertaking to protect the stabbing victim. *See id.* at 597–98. The Illinois Supreme Court held that Interstate assumed a duty to provide reasonable protection under the particular language of its contract with the Authority. *See id*. at 599–600. On the other hand, "Because the Authority did not undertake to perform the guard services itself, it cannot be held to have had a duty to protect [the victim]. The Authority's duty was limited by the extent of the undertaking, viz, to use reasonable care in engaging Interstate to provide the guard services. The Authority can therefore be liable at most for the negligent hiring of Interstate." *Id.* at 599 (citing Restatement (Second) of Torts § 411 (Am. L. Inst. 1965) (other citations omitted)).

How *Pippin*, a case primarily about contract interpretation and security services, applies here has not been made clear. Yet *Pippin* is the only voluntary undertaking case Keenan cites. *See* Resp. 8–13. Keenan appears to be arguing that the purported checklist, like the contract in

14

*Pippin*, creates a binding duty to ensure the cable is secured at seven feet. *See* Resp. 9–10, 12–13. This argument fails for the following reasons.

    *1. The checklist was not a Home Depot policy on the day of the accident.*

Keenan bears the burden to prove a voluntary undertaking by Home Depot. *See Figueroa v. Evangelical Covenant Church*, 879 F.2d 1427, 1435–36 (7th Cir. 1989). A written checklist for periodic store inspections can constitute a voluntary undertaking in Illinois, though the scope of the undertaking must be construed narrowly. *See, e.g.*, *Newsom-Bogan v. Wendy's Old Fashioned Hamburgers of N.Y., Inc.*, 953 N.E.2d 427, 431–32 (Ill. App. Ct. 1st Dist. 2011) (checklist required inspections every 15 minutes).

Keenan cites no evidence of when the purported checklist became Home Depot policy, if it ever did. *See* Resp. 8–10. The checklist says that it was revised on September 14, 2006, nearly a decade before Keenan's accident. ECF No. 72-7 at PageID Nos. 404–05. Keenan identifies no evidence that any employee working at the Countryside Home Depot store was aware of the checklist dated September 14, 2006. *See* Resp. 9–10.

It is undisputed that Home Depot posts policies and training materials on a website accessible to its employees. *See* Grzeskowiak Dep. 22:5–17, cited in SAF ¶ 21, ECF No. 99-1. Home Depot submits the affidavit of one of its district managers averring that the checklist dated September 14, 2006, was not a Home Depot policy on the day of Keenan's accident. Aff. of Joan Morris ¶¶ 3–5, ECF No. 100-1, cited in Resp. to SAF ¶ 21, ECF No. 100. This averment has not been rebutted. As far as this record shows, Keenan's lawyer deposed two Home Depot employees but did not ask about, and no deponent mentioned, the checklist dated September 14, 2006. *See id.* The undisputed evidence establishes that Countryside Home Depot employees used a different Home Depot checklist, ECF No. 95-3, on the day of Keenan's accident. Resp. to SOF ¶ 6. That checklist does not require the inspector to check the safety cable's height. ECF

No. 95-3 at 1. Keenan does not dispute this testimony or argue that the checklist used on the day of the accident created a duty to check the safety cable's height. *See* Resp. to SOF ¶ 6.

A voluntary undertaking to provide aid may ordinarily be abandoned for any or no reason anytime "unless, by giving the aid, [the party undertaking the aid] has put the other in a worse position than he was in before the actor attempted to aid him." *Bell v. Hutsell*, 955 N.E.2d 1099, 1108 (Ill. 2011) (quoting Restatement (Second) of Torts § 323 cmt. c, at 137 (Am. L. Inst. 1965)). If the checklist dated September 14, 2006, ever was a Home Depot policy (no finding is made or implied), the undisputed evidence demonstrates that Home Depot abandoned its voluntary undertaking before the day of Keenan's accident. Thus, the checklist dated September 14, 2006, does not create a fact issue on this record. Additionally, the September 14, 2006, checklist is not properly before the court for the procedural and evidentiary reasons that follow.[3]

   2. *The checklist has not been authenticated.*

Home Depot objects to the September 14, 2006, checklist's admissibility on "foundation," that is authenticity, grounds, noting correctly that the page numbering on the purported checklist is inconsistent and shows that the exhibit is incomplete. *See* Reply 4–5, ECF No. 101; ECF No. 72-7. Although summary judgment "materials must . . . be admissible as evidence at trial, '. . . the form produced at summary judgment need not be admissible.'" *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 955–56 (7th Cir. 2021) (quoting

---

3   Home Depot argues that Keenan violated LR 56.1 by citing the checklist directly in his summary judgment response brief and omitting it from his LR 56.1(b)(3) statement of additional facts. *See, e.g.*, Resp. 9, 12. Keenan cites the purported checklist in several paragraphs of his LR 56.1(b)(3) response to Home Depot's statement of facts, however. *E.g.*, Resp. to SOF ¶¶ 7, 17, 21, 51. The court therefore does not disregard the checklist under LR 56.1, though the inappropriate citations in Keenan's response memorandum will be disregarded.

*Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010)). But a party may object at summary judgment that "material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence" at trial. Fed. R. Civ. P. 56(c)(2). When an objection to summary judgment evidence is raised, the objected-to evidence may be considered "only if [the court] conclude[s] that [the evidence] would be admissible at trial." *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020) (citing Fed. R. Civ. P. 56(c)(2) and *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017)). Thus, when an objection has been raised, "[d]ocuments must be authenticated by an affidavit that lays a proper foundation for their admissibility, even at the summary judgment stage." *Id.* (citing *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 578 (7th Cir. 2015)).

Home Depot has objected to the authenticity of the purported checklist since the first round of summary judgment briefing. *See, e.g.*, ECF No. 73 at 4. This court allowed Keenan to file a surreply in order to give him an opportunity to address Home Depot's objections. ECF No. 80. Yet Keenan has supplied no affidavits authenticating the exhibit.

Authenticating a document requires its proponent to produce admissible evidence "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). For a commercial website, "an affidavit of a witness, when viewed in combination with circumstantial indicia of authenticity (such as the existence of the URL, date of printing, or other identifying information)," generally suffices to satisfy the authentication requirement. *S.E.C. v. Berrettini*, 2015 WL 5159746, at *6 (N.D. Ill. Sept. 1, 2015) (quoting *Foreward Magazine, Inc. v. OverDrive, Inc.*, 2011 WL 5169384, at *3 (W.D. Mich. Oct. 31, 2011)).

Keenan's lawyer represents that he obtained the checklist excerpt on an unspecified date from Home Depot's website, but he has provided no affidavit or declaration authenticating the

17

exhibit. *See* ECF No. 99 at 5. The exhibit does not contain sufficient facial indicia of authenticity. It lacks a URL and date of printing. *See* ECF No. 72-7. The page numbering and department codes on the bottom of the exhibit indicate that the document is incomplete, and nothing indicates its origins. *See id.* None of this has been explained. Home Depot's authentication objection is therefore sustained. *See Berrettini*, 2015 WL 5159746, at *6.

      *3. Keenan did not disclose the checklist during discovery.*

Home Depot's related objection that Keenan ambushed it with the purported checklist in violation of Federal Rule of Civil Procedure 26(a)(1) is also sustained. Reply 4. Since the first round of summary judgment briefing, Home Depot has objected that Keenan did not include the purported checklist among the initial disclosures Rule 26(a)(1) requires. Reply 4; 1st Reply 4. Initial Rule 26(a)(1) disclosures must include "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). Parties have an ongoing duty to supplement their disclosures "in a timely manner" upon learning that "the disclosure is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).

Keenan did not respond to Home Depot's Rule 26(a)(1) arguments at any stage of the two rounds of summary judgment briefing. *See* Resp. 4–5. In view of Keenan's failure to contradict Home Depot's assertions that he failed to disclose the purported checklist during discovery, or explain why he did not do so, the checklist must be excluded from consideration at summary judgment. Fed. R. Civ. P. 37(c)(1); *see also, e.g.*, *United States ex rel. Youn v. Sklar*, 273 F. Supp. 3d 889, 900 (N.D. Ill. 2017).

## IV. Conclusion

For the reasons stated, plaintiff has not created a fact issue on the duty element of his claims. The court therefore need not analyze proximate causation. *McCarty*, *supra*, 927 F.3d at 472 (citing *Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018)). Defendant's amended motion for summary judgment is granted.

Dated: September 20, 2021

/s/
Joan B. Gottschall
United States District Judge